# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: APPLICATION OF THE,
REPUBLIC OF TURKEY FOR AN
ORDER UNDER 28 U.S.C. § 1782 TO       Civil Action 2:20-mc-36
CONDUCT DISCOVERY FOR USE IN          Chief Judge Algenon L. Marbley
FOREIGN PROCEEDINGS,                  Magistrate Judge Elizabeth A. Deavers


## OPINION AND ORDER

This matter is before the Court on an *ex parte* application seeking leave, pursuant to 28

U.S.C. § 1782 and Federal Rules of Civil Procedure 26 and 45, to serve Respondents[1] with

---

[1]According to the *ex parte* application, subpoenas are directed to the following Respondents: (1) Horizon Science Academy Cincinnati High School, Inc.; (2) Horizon Educational Services of Columbus, Inc. d/b/a Horizon Science Academy Columbus High School; (3) Horizon Science Academy, Inc. d/b/a Horizon Science Academy Columbus Middle School; (4) Horizon Science Academy Primary d/b/a Horizon Science Academy – Columbus Primary School; (5) Horizon Science Academy Elementary School, Inc.; (6) Horizon Science Academy – Dayton d/b/a Horizon Science Academy – Dayton Elementary School ; (7) Horizon Science Academy Dayton High School, Inc.; (8) Horizon Science Academy Dayton Downtown, Inc.; (9) Noble Academy – Columbus, Inc.; (10) Figs Café and Bakery LLC; (11) MDN of Dayton LLC; (12) Star Consultants, Inc.; and (13) Florence Freeman (a.k.a. Florence Gbaya and Florence Prescott). (ECF No. 1 at 1 n.1.)

Of the thirteen original proposed subpoenas attached to the application, seven are blank. The remaining six are directed to Figs Café and Bakery LLC, Florence Freeman (a.k.a. Florence Gbaya and Florence Prescott), Horizon Science Academy Cincinnati High School, Inc., MDN of Dayton LLC, Noble Academy – Columbus, Inc., and Star Consultants, Inc. (ECF No. 1-1.) Of the thirteen revised subpoenas attached to Petitioner's supplemental filing, eight are blank. The remaining five are directed to Figs Café and Bakery LLC, Florence Freeman (a.k.a. Florence Gbaya and Florence Prescott), MDN of Dayton LLC, Noble Academy – Columbus, Inc., and Star Consultants, Inc. (ECF No. 14-2.) The subpoenas request the production of documents.

The following Respondents have opposed the application:  (1) Horizon Science Academy Cincinnati High School, Inc.; (2) Horizon Educational Services of Columbus, Inc. d/b/a Horizon Science Academy Columbus High School; (3) Horizon Science Academy, Inc. d/b/a Horizon Science Academy Columbus Middle School; (4) Horizon Science Academy Primary d/b/a Horizon Science Academy – Columbus Primary School; (5) Horizon Science Academy Elementary School, Inc.; (6) Horizon Science Academy – Dayton d/b/a Horizon Science

subpoenas filed by Petitioner, the Republic of Turkey.  (ECF No. 1.)   Petitioner has filed a

supplemental memorandum in support, including revised subpoenas.  (ECF No. 14.)  The School

Respondents have filed a Response in Opposition (ECF No. 17), and Petitioner has filed a Reply

(ECF No. 19).  On February 2, 2021, the School Respondents filed a Supplemental

Memorandum.  (ECF No. 20.)  On February 4, 2021, Petitioner filed a response.  (ECF No. 21.)

For the following reasons, the *ex parte* application is **DENIED.**

# I.

According to the application, relief is requested for purposes of obtaining "discovery in

aid of an ongoing criminal investigation being conducted by the Turkish Ministry of Justice in

the Republic of Turkey."[2]  (ECF No. 1 at 5.)   The application asserts that "substantial evidence

exists to suggest that Concept Schools ("Concept") and a host of insiders and affiliated

companies and individuals are engaged in criminal activity in the United States and Turkey."

(*Id.*)  Further, "Petitioner requires additional evidence of this criminal activity in order to further

its investigation into various violations of Turkish law, including potential money laundering and

---

Academy – Dayton Elementary School; (7) Horizon Science Academy Dayton High School,
Inc.; (8) Horizon Science Academy Dayton Downtown, Inc.; and (9) Noble Academy–
Columbus, Inc. (collectively the "School Respondents"). (ECF No. 17 at 2 n.1.)

[2] Petitioner filed similar applications in the Northern District of Ohio, Case No. 1:20-mc-
85 (Polster, J.) and the Northern District of Illinois, Case No. 20-5012.  *See* ECF No. 14 at 1 n.1.
On January 29, 2021, in the Northern District of Ohio case, Judge Polster issued an order, stating
in part:

> On or before February 12, 2021 respondent must produce any all documents
> evidencing the flow of funds between respondent's schools and the Republic of
> Turkey or certify that no such documents exist. Any other discovery sought by
> petitioner must be accomplished through a mutual legal assistance treaty
> ("MLAT").

(ECF No. 20-1.)

fraud offenses through which Respondents are believed to be funneling the proceeds of this criminal activity from the United States into the Republic of Turkey." (*Id*.) To this end, Petitioner explains that it retained "counsel and a team of former federal prosecutors and investigators to investigate [] whistleblower allegations and to determine whether funds that were transmitted into Turkey by companies and individuals affiliated with Concept were derived from criminal activity that took place or is currently taking place in the United States." (*Id*. at 6.)

Accompanying the application is a 38-page unsworn Statement of Facts signed by counsel setting forth roughly 110 paragraphs of factual allegations detailing Petitioner's investigative findings. (ECF No. 1-2.) By way of introduction, the Statement of Facts sets forth the following:

> Concept Schools ("Concept"), its officials, and the 31 charter schools falling under its umbrella have been long besieged by allegations of corrupt practices. Various whistleblowers have alleged that Concept (and other similarly organized charter school management companies throughout the United States) were created to siphon public, tax-payer funds away from the education of children in order to finance the international political activities of Fethullah Gulen, an exiled Turkish cleric residing in the State of Pennsylvania. *See U.S. Charter Schools Tied to Powerful Turkish Imam*, CBS News – 60 Minutes (May 13, 2012) http://www.cbsnews.com/news/uscharter-       schools-tied-to-powerful-turkish-imam/.
>
> According to whistleblowers who have gone public with their concerns, Turkish ex-patriots who are loyal to Mr. Gulen created Concept and a shadowy web of insider companies to illicitly divert millions in federal and state education dollars away from the education of children in order to finance Mr. Gulen's international political ambitions. These insider companies provide necessary goods and services to Concept that include, but are not limited to, construction, classroom supplies and furniture, real estate, and internet and technology services, among others.
>
> In addition to various fraud schemes, the whistleblowers have publicly alleged that Concept and the insider companies further their conspiracy by abusing the immigration system through the sponsorship of large numbers of predominantly Turkish followers of Gulen for employment-based visas and green cards. The recipients of these immigration benefits are generally put to work as teachers in Concept schools or in other positions within insider companies. According to the whistleblowers, the foreign national teachers lack the training and certification necessary to educate children but are utilized in the classrooms because of their

willingness to "kickback" a portion of their salary to various organizations affiliated with the Gulen Movement—a requirement often referred to as "Tuzuk" (a Turkish word translating to "bylaw" in English).

In furthering this conspiracy, whistleblowers allege that Concept, its officials, and other Gulen loyalists are violating a host of federal and state laws, including those prohibiting securities and wire fraud, tax fraud, money laundering, procurement fraud, campaign finance laws, and various rules governing charitable organizations. Petitioner has initiated an investigation within its' own borders to determine whether the proceeds derived from these illegal activities in the United States are being unlawfully transported and transmitted to individuals in Turkey in violation of Turkish criminal law, including international money laundering and fraud. *See* Letter from Hon. Serdar Kilic, Turkish Ambassador to the United States (Aug. 28, 2020), attached hereto as **Exhibit 1**.

These allegations have not gone entirely unnoticed by United States law enforcement. In 2014 the U.S. Department of Justice ("DOJ") revealed that it was conducting a criminal investigation into Concept when the Federal Bureau of Investigation ("FBI") executed search warrants on various Concept schools and related companies. According to an affidavit filed in support of those warrants, the focus of the FBI's investigation was on allegations that Concept was engaged in fraud and other abuses of the "E-Rate" program, a Federal Communications Commission ("FCC") program that provides federal funding to enhance internet access at schools and libraries. *See* FBI Search Warrant Affidavit, Case No. 1:14-mc-00288 (N.D. Ill. 2014), attached hereto as **Exhibit 2**. In particular, the FBI found that Concept School officials were awarding E-Rate funded contracts to insiders and other suspected Gulen loyalists in violation of federal rules requiring that such contracts be awarded through a competitive bidding process. *Id.*

Various media outlets have also published extensive investigative reports, raising concerns regarding Concept's operations and describing conduct that suggests Concept and affiliated companies are engaged in criminal activity. *See, e.g.*, *Charter Official Made $100,000 on Deal*, Chicago Sun-Times (Dec. 23, 2013), https://www.pressreader.com/usa/chicago-suntimes/20131223/282454231816690.

This reporting also includes troubling allegations that Concept insiders and school officials have violated a host of federal election laws in order to attempt to influence the U.S. political system through illicit campaign contributions and influence campaigns. *See, e.g.*, *Ohio Taxpayers Provide Jobs to Turkish Immigrants Through Charter Schools*, Beacon Journal (July 5, 2014), https://www.beaconjournal.com/article/20140705/NEWS/307059540.

Concept consistently denies these allegations and publicly maintains that the schools operate independently under the governance of their local board.

(ECF No. 1-2, at ¶¶ 2-9.)

Against this backdrop of allegations, Petitioner explains that it retained counsel and a team of former federal prosecutors and investigators to investigate these whistleblower allegations and to determine whether funds that were transferred into Turkey by companies and individuals affiliated with Concept Schools may have been derived from criminal activity in the United States. (*Id*. at ¶ 10.)

According to Petitioner, this investigation has validated many of the whistleblower's allegations and revealed substantial indicia of criminal activity.  (*Id*.)  For example, Petitioner asserts that the investigation uncovered substantial evidence that schools operating under the Concept umbrella have secretly and unlawfully awarded millions of dollars in contracts to shell companies formed by insiders; construction permits and other public records demonstrate that large construction contracts were awarded to insiders, several of whom appear to have no prior track record of performing construction work and may not even be licensed as contractors or engineers; and the awarding of several of these construction contracts to insiders suggests that Concept's affiliates may have committed securities fraud.  (*Id.* at ¶¶ 11-13.)  Other information uncovered included alleged abuses of federally funded Child Nutrition Programs contracts; instances of suspected procurement fraud, including purchases of classroom furniture and equipment from companies formed by Concept insiders; and millions of dollars wasted through sham arm's length real-estate transactions.  (*Id.* at ¶¶ 14-16.)  Further, Petitioner asserts that Concept managed schools frequently pay rent at above market rates to companies controlled by insiders.  (*Id.* at 17.)  According to Petitioner, the Ohio Auditor has expressed serious concerns about Concept's governance and potential conflicts of interest.  (*Id.* at 18, Exhibit 3.)

Petitioner also asserts that a review of U.S. Department of Labor records support allegations that Concept is committing immigration and visa fraud in order to generate illicit

kickbacks and re-locate Turkish supporters of Gulen into the United States.  According to

Petitioner, Concept sponsors far more foreign nationals for teaching positions than does almost

any other school district in the United States, almost all of whom are from Turkey. (*Id*. at ¶¶ 19-

21.)  Analysis of Ohio teacher pay records suggests that these Turkish teachers, many of whom

lack proper credentials, are required to kickback a portion of their salary to further the Gulen

movement (as required by the "Tuzuk").  (*Id.* at ¶ 22.)  The same insider companies that receive

large contracts from Concept and its related entities are themselves frequently sponsor visas and

permanent residency for foreign nationals and sponsor only Turkish nationals for green cards.

(*Id.* at ¶ 23.)  Finally, Petitioner contends that many of the school executives and insiders who

benefit from Concept contracts have made several large and suspicious campaign contributions

to various public officials. (*Id*. at ¶ 25.)

Petitioner identifies seventeen individuals or entities, including some of the Respondents,

as relevant to the above allegations.  (*Id*. at ¶¶ 27-43.)  Petitioner's allegations proceed to

describe various instances of "conflicts of interest and corrupt insider dealing, allowing the

organization to secretly siphon funds away from the educational purposes for which they are

intended."  (*Id.* at ¶ 45.)  For example, Petitioner details alleged securities fraud in connection

with alleged improper awards of millions of dollars in municipal bond-financed construction

contracts to companies owned by favored from Concept schools insiders, (*Id*. at  ¶¶ 45-60);

unlawful awards of U.S. Department of Agriculture Child Nutrition Program Contracts to

Companies Affiliated with Concept Officials (*Id.* ¶¶ 61-64); insider real estate dealings (*Id*. at ¶¶

65-69); conflicts of interest to enable inflated lease agreements (*Id*. at ¶¶ 70-73); the award of

contracts to Mr. Cinar's companies (*Id.* at 74-79)  and immigration fraud. (*Id*. at ¶¶ 92-100).

Petitioner explains that its findings are corroborated by an investigation undertaken in 2014, by the

6

FBI, Department of Education-Office of Inspector General, and FCC Office of Inspector General into Concept's use of federal grant dollars granted through the FCC E-Rate program (*Id.* at 80-91.)

Finally, Petitioner alleges Concept and affiliates engaged in specific criminal conduct in the United States in violation of federal law, including wide-ranging wire fraud and money laundering, federal programs bribery, theft of federal funds, federal visa fraud, making false statements, filing a false tax return, obstruction, or witness tampering. (*Id*. at ¶¶ 106-110.) Petitioner also alleges violations of state law, including unlawful interest in public contract; community schools conflict of interests; and money laundering. (*Id*. at ¶ 111.)

## II.

"'Section 1782 provides federal-court assistance in gathering evidence and testimony for use in foreign tribunals.'" *Matter of De Leon*, No. 1:19-MC-15, 2020 WL 1180729, at *3 (S.D. Ohio Mar. 12, 2020), *appeal dismissed sub nom. In re De Leon*, No. 20-3406, 2020 WL 3969865 (6th Cir. May 26, 2020) (quoting *JSC MCC EuroChem v. Chauhan*, No. 18-5890, 2018 WL 9650037, at *1 (6th Cir. Sept. 14, 2018)).

Section 1782(a) provides, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

In short, "[a] district court may order discovery under § 1782 if, among other considerations, at least three prerequisites are met:  (1) the person from whom the discovery is sought "resides or is found" in the district; (2) the discovery sought is 'for use in a proceeding in a foreign or international tribunal[;]' and (3) the application for discovery is made by 'any interested person[.]'  28 U.S.C. § 1782(a)."  *In re Application for Discovery Pursuant to 28 U.S.C. § 1782*, No. 1:19-MC-0102, 2020 WL 364222, at *1 (N.D. Ohio Jan. 22, 2020). To invoke § 1782, an applicant must meet the statutory requirements set forth in § 1782(a); the proceeding before the foreign tribunal must be either "reasonably contemplated," or must actually be pending; and the district court must determine that the issuance of discovery is proper under certain discretionary factors (the "*Intel* factors").  *Matter of DeLeon,* 2020 WL 1180729, at *3 (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004)).

Thus, whether to grant § 1782(a) discovery ultimately is a "discretionary decision" and "'a district court is not required to grant a § 1782 discovery application simply because it has the authority to do so.'"  *In re Application to Obtain Discovery for Use in Foreign Proceedings*, 939 F.3d 710, 732 (6th Cir. 2019) (quoting *Intel*, 542 U.S. at 264).  "The *Intel* factors, which guide that discretionary decision, require careful consideration of the facts and circumstances of the case." *Id.*

The *Intel* factors properly are summarized as follows:

(1) whether the person from whom the discovery is sought is a participant in the foreign proceeding such that the discovery is within the foreign tribunal's jurisdictional reach and thus accessible absent [§] 1782 relief; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign court to U.S. federal court assistance; (3) whether the [§] 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of the foreign country or the United States; and (4) whether the subpoena contains unduly intrusive or burdensome requests.

8

*De Leon*, 2020 WL 1180729, at *3.  Again, however, whether discovery is appropriate under these factors ultimately is within the district court's discretion.  *Matter of DeLeon,* 2020 WL 1180729, at 3 (citing *Chauhan*, 2018 WL 9650037, at *1).

### III.

#### A.  The Statutory Factors

The School Respondents do not challenge Turkey's status as an interested person under § 1782.  Nor do they suggest that they, as the persons from whom discovery is sought, are not found or do not reside in this District.  Rather, their argument here is limited to the second statutory factor – whether the discovery sought is for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  On this issue, they contend that, because a proceeding before a foreign tribunal is neither "reasonably contemplated" nor actually pending, Petitioner's application should be denied.  The Court will begin its analysis with that issue.

"The statute itself and the case law applying it" make clear "that a foreign proceeding need not *be actually pending* in order to obtain relief."  *financialright GmbH v. Robert Bosch LLC*, 294 F. Supp. 3d 721, 729 (E.D. Mich. 2018) (citing *Mees v. Buiter*, 793 F.3d 291, 299 (2nd Cir. 2015)) (emphasis in original).  By its plain language, the statute requires only that the material sought be "'for use in a proceeding[,]" not "for use in pending litigation.'" *Id.;* 28 U.S.C. § 1782.  Such a proceeding, however, must be "within reasonable contemplation."  The applicant "must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated."  *Id*. (quoting *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P*., 798 F.3d 113, 123 (2d Cir. 2015)); *see also, Intel*, 542 U.S. at 259 ("[W]e hold that § 1782(a) requires only that a dispositive ruling

... be within reasonable contemplation.").  Stated more colorfully, the application must show "'[a]t a minimum, some concrete basis from which [the Court] can determine that the contemplated proceeding is more than just a twinkle in counsel's eye.'" *Id.* (quoting *Certain Funds,* 798 F.3d at 124).  Further*,* "a district court must insist on reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *Id.*  An applicant must provide some objective indicium that the action is being contemplated." *Certain Funds*, 798 F.3d at 123; *see also In re Sabag*, No. 119MC00084JPHTAB, 2020 WL 4904811, at *3 (S.D. Ind. Aug. 18, 2020) (vacating grant of application under § 1782 where there was "no objective indication that a proceeding in a foreign or international tribunal was within reasonable contemplation" and noting that, "subjective desire, alone, is not enough").

In support of its application, Petitioner submitted a copy of an unsworn letter from the Turkish Ambassador to the United States, Serdar Kilic.  (ECF No. 1-3.)  In this letter, the Ambassador "confirms that Law Enforcement Authorities of the Republic of Turkey are conducting various criminal investigations into Fetullah Gulen and his organization for suspected criminal activity."  (*Id.*)  He explains that "[t]he current focus of one of these investigations is widespread and includes the suspected laundering of criminal proceeds in violation of Turkish laws and regulations, including Article 282 of the Criminal Code."  (*Id*.)  He further explains that, "[s]pecifically, Turkish authorities are investigating a scheme through which criminally derived funds are being laundered from certain corporations and individuals throughout the United States, and then returned to Turkey for the continued financing of illicit activities in violation of Turkish laws. (*Id.*)  Additionally, he states that "the Government of Turkey has retained U.S.-based counsel, Nixon Peabody LLP, to receive more information about the criminal activities of these corporations and individuals in the United States" (*Id.*)  Finally,

he declares optimism "that the assistance of the U.S. judicial system in compelling the production of information relevant to these investigations will assist in bringing the responsible parties to justice in Turkey and the United States." (*Id.*)

Petitioner also submitted, in connection with its supplemental memorandum, a copy of a sworn declaration from Gokhan Karakose, the Deputy Chief Public Prosecutor for Ankara. (ECF No. 14-1.) This declaration, signed on October 2, 2020, was prepared for the Northern District of Illinois proceeding. According to the declaration, Mr. Karakose's office is responsible for investigating violations of the Turkish Criminal Code and initiating prosecutions. (*Id.* at ¶ 2.) There are pending investigations regarding several crimes committed by Fetullah Gulen, a United States resident, and individuals and entities connected with him. (*Id.* at ¶ 3.) Some of these investigations are ongoing, some are at the prosecution stage and some proceedings have resulted in conviction. (*Id.*) Further, some of the investigations have examined whether the proceeds of illicit activities taking place in the USA and Turkey have been transferred, through international wire transfers or other means, to individuals and entities operating in Turkey or in the USA in violation of the prohibitions on money laundering codified in Article 282 of the Turkish Penal Code. (*Id.* at ¶ 4.) Petitioner did not provide a copy Article 282[3] of the Turkish Penal Code for the Court's review, but the Prosecutor explains that it

---

[3] **Laundering of Assets Acquired from an Offence**

**Article 282**
(1) (Amended on 26/6/2009 - By Article 5 of the Law no. 5918) Where a person conducts any act in relation to an asset, which has been acquired as a result of an offence which carries a minimum penalty of six months imprisonment, in order to transfer such asset abroad or to give the impression that such asset has been legitimately acquired and conceal the illegitimate source of such, shall be subject to a penalty of imprisonment for a term of three to seven years and a judicial fine of up to twenty thousand days.
(2) (Added on 26/6/2009 - By Article 5 of the Law no. 5918) Any person who, without participation in commission of the offence set out in the above-mentioned paragraph, purchases,

"prohibits the transferring of assets acquired from a criminal offense in a manner designed to conceal the illicit source of such proceeds or in a manner designed to give the impression that such assets have been legitimately acquired." (*Id*. at ¶ 5.) Further, he explains that the testimony and documents sought "will significantly and materially advance [the] ongoing criminal investigation into the … violations of Turkish law." (*Id*. at ¶ 6.)

In Petitioner's view, these documents demonstrate that the requested discovery is material and necessary to further ongoing criminal investigations. Further, Petitioner contends that the fact the requests for information have come directly from two senior Turkish government officials is significant and worthy of deference.

To the contrary, Respondents contend that neither of these documents suffice for purposes of § 1782. According to Respondents, the documents do not provide a basis to determine that a legitimate criminal investigation exists for several reasons. First, Respondents assert that the documents do not mention them, or anyone affiliated with the Academies. Second, Respondents claim that the documents do not suggest with certainty that criminal charges will be brought. On this point, Respondents explain that the documents do not indicate

---

accepts, keeps or uses this asset by being aware of its value and such nature shall be subject to a penalty of imprisonment for a term of two to five years.
(3) Where this offence is committed by a public officer or professional person in the course of his duty then the penalty to be imposed shall be increased one half.
(4) Where this offence is conducted in the course of the activities of an organisation established for the purpose of committing an offence, the penalty to be imposed shall be doubled.
(5) Where a legal entity is involved in the commission of this offence it shall be subject to security measures specific to the legal entities
(6) In relation to the offences defined in this article, no penalty shall be imposed upon a person who directly enables the securing of assets, or who facilitates the securing of such assets, by informing the relevant authorities of the location of such before the commencement of a prosecution.
Venice Commission's 2016 translation,
https://www.mevzuat.gov.tr/MevzuatMetin/1.5.5237.pdf

against whom charges will be brought, what the charges will be or when the alleged conduct occurred. Third, Respondents assert that the lack of specificity "reeks of subterfuge." In short, in Respondents' view, the information set forth in these documents does not reflect that a legitimate investigation was intended in Turkey.

As noted, whether the Application satisfies the second statutory requirement turns on whether Turkey's purpose in seeking discovery here is, as represented, for use in a Turkish criminal investigation or proceedings. Frankly, the evidence submitted by Petitioner on this issue is not particularly detailed. In contrast to the comprehensive narrative provided by counsel, the Deputy Chief Public Prosecutor's declaration provides what can only be described as the most minimal information. (ECF No. 1-2.) Given that, according to his declaration, his office investigates violations of Turkish law and initiates prosecutions, (ECF 14-1 at 2), more detail and specifics would be expected.

These bare minimum assertions seem to distinguish the situation here from those where courts have found sufficient indicia of a contemplated proceeding. *See, e.g., Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,* 747 F.3d 1262, 1271 (11th Cir. 2014) (finding statutory requirements met in light of applicant's "facially legitimate and detailed explanation of its ongoing investigation, its intent to commence a civil action against its former employees, and the valid reasons for [applicant] to obtain the requested discovery under the instant section 1782 application before commencing suit."). Instead, they seem more in line with cases where courts have found sufficient indicia lacking. *See, e.g., Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 101 (2d Cir. 2020) (finding that applicant's submissions did not present a legal theory supporting a proceeding or clearly lay out the content of his claims and characterizing counsel's representations of criminal claims as "at best

speculative" and "tentative"); *In re Application of Gov't of Lao People's Democratic Republic v. For an Order Pursuant to the United Nations Convention Against Corruption*, No. 1:15-MC-00018, 2016 WL 1389764, at *7 (D. N. Mar. I. Apr. 7, 2016) (finding that applicant could not show that a dispositive ruling was within reasonable contemplation where letter from Ministry of Justice did not mention when a dispositive ruling or even a decision to prosecute would be made and uncertainty in the criminal investigation failed to show how any dispositive motion could be within reasonable contemplation); *Certain Funds,* 798 F.3d at 124 (concluding that, where all that was alleged before the district court was that counsel had been retained and the *possibility* of initiating litigation was being discussed, little had been done to make an objective showing that the planned proceedings were within reasonable contemplation).

Petitioner's argument that these documents are worthy of significant deference here simply because they were made by high ranking governmental officials is not particularly persuasive. Vague and conclusory statements lacking in specificity are not worthy of elevated status simply because they are offered by such officials. At most, the takeaway from Petitioner's evidentiary submissions, standing on their own, is that a prosecution of some unidentified individual or entity (possibly Gulen; possibly others) for money laundering, in violation of Article 282 of the Turkish Penal Code, may be contemplated.

On the other hand, the Court acknowledges the depth of the investigation undertaken on Turkey's behalf as detailed in Petitioner's application and the information which it reveals. That information arguably fills in some of the details the government officials' submissions are lacking. Reading the government officials' statements in conjunction with counsel's statement of facts provides a more robust picture of the reasonable likelihood of proceedings. Moreover, while Respondents emphasize the suspect nature of Petitioner's true intentions here, they have

14

put forth no evidence on that point.  The Court will not accept Respondent's allegations of questionable motives on Turkey's part, based on nothing more than the argument of counsel, in considering the statutory factors of 28 U.S.C. § 1782.

Instead, under these circumstances, in considering Turkey's application, the Court will assume, without deciding, that the second statutory requirement is met and will turn to the discretionary *Intel* factors.

## B. Discretionary factors under *Intel*

### 1.    The First *Intel* factor

The first factor considers whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264.  If so, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad" because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence."  *Id.*  "In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*

Petitioner asserts that the Respondents to this application are all nonparties located outside the jurisdictional reach of Turkish courts.  (ECF No. 1 at 12.) Respondents do not challenge or address this *Intel f*actor to any meaningful degree.  Accordingly, this factor supports the Court's exercise of discretion to grant the Application.

### 2. The Second *Intel* Factor

Under the second factor the Court is asked to examine "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."  *Intel*, 542 U.S. at 264. Petitioner asserts that this factor supports granting the application because "this very petition

15

arises from the Turkish government seeking the assistance of U.S. courts in furthering an important, ongoing criminal investigation in Turkey." (ECF No. 1 at 11.) Respondents also do not dispute this or contend that this factor supports denying discovery. Accordingly, this factor also supports the Court's exercise of discretion to grant the Application.

### 3. The Third *Intel* Factor

With respect to the third factor, the Court considers "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel Corp.*, 542 U.S. at 265. Although not neatly framed as such, Respondents focus very heavily on this factor, arguing at some length that what they consider to be Turkey's obvious and well-documented motives here strongly disfavor granting the § 1782 application. Further, they contend that Petitioner's failure to proceed under the more typically used procedure involving a Mutual Legal Assistance Treaty ("MLAT"), where a foreign government seeking evidence in the United States first requests assistance from U.S. prosecutors, is also suspect. According to Respondents, once an MLAT request has been received and evaluated by the U.S. government, the relevant U.S. Attorney's Office or the Department of Justice will generally file an application with the appropriate court on behalf of the foreign government to obtain the requested evidence. They have submitted as supplemental authority on this issue *Federal Republic of Nigeria v. VR Advisory Services, Ltd.,* -- F. Supp.3d--, No. 20 MISC. 209 (PAE), 2020 WL 6547902, at *7–8 (S.D.N.Y. Nov. 6, 2020).[4] (ECF No. 18.)

Petitioner asserts to the contrary that it may proceed under § 1782 regardless of the existence of an available MLAT procedure. Petitioner dismisses the decision in *Federal Republic of Nigeria* as readily distinguishable and "deeply flawed." (ECF No. 19 at 12, 13.)

---

[4] This case is currently on appeal to the Second Circuit Court of Appeals.

16

Petitioner argues that when Congress passed what is now codified as 18 U.S.C. § 3512, and generally recognized as a more efficient vehicle through which U.S. Attorneys could facilitate discovery requests from foreign governments, it specifically did not foreclose a foreign government's ability to obtain assistance in a criminal investigation or prosecution pursuant to § 1782. *See* 18 U.S.C. § 3512(g).  According to Petitioner, there is "no room to doubt that foreign governments may submit discovery requests *either* through the U.S. Department of Justice *or* to U.S. courts directly."  (ECF No, 19 at 14.)

The parties acknowledge that the United States and Turkey have an MLAT.  *See Treaty Signed at Ankara June 7, 1979;* T.I.A.S. No. 9891 (1981).  Accordingly, the Court will begin its analysis with a consideration of its significance here.

Under the Treaty, each of the Contracting Parties may submit to the other Party requests for assistance in criminal matters. *Id.* Ch. 2, Sec. 1, Art. 20. Criminal matters for which mutual assistance shall be afforded include "investigations and criminal proceedings in respect of offenses, the punishment of which falls or would fall within the jurisdiction of the judicial authorities of the Requesting Party under its law." *Id.* Art, 21, §2.  Mutual assistance includes "effecting the production, preservation and authentication of documents, records, or articles of evidence."  *Id.* Art. 21 § 3(c).  The scope of use "is limited to the purposes of investigations or criminal proceedings and adjudications of claims for damages connected with the offense which is the subject of the investigation or proceedings in the Requesting Party."  *Id.* Art. 23.  The Competent Authorities under this chapter of the Treaty, charged with making and transmitting requests, are the United States of America Department of Justice and the Ministry of Justice of the Republic of Turkey.  *Id.* Sec 5, Art. 38 (1).  If the Requested Party determines that the request for assistance is not consistent with the provisions of this Chapter or that it cannot be executed,

that Party shall immediately inform the Requesting Party and specify the reasons. *Id*. Art. 39. Judicial assistance may be refused under certain circumstances, including if the investigation or proceedings concerns an offense which the Requested Party considers to be a political offense or an offense connected with a political offense; or if the Requested Party considers that execution of the request is likely to prejudice its sovereignty, security, or similar essential interests. *Id.* Sec. 1, Art. 22. 1(a)i; 1(b). Further, there are limits as to the types of criminal matters for which the Parties will authorize discovery. *Id.* Appendix.

Under the typical MLAT review process, when a discovery request to the United States is approved, it is the U.S. Department of Justice ("DOJ") that asks a federal district court to issue the subpoenas. *See* 18 U.S.C. § 3512(a)(1) (authorizing federal courts to issue orders to execute requests from a foreign authority "[u]pon application, duly authorized by an appropriate official of the Department of Justice"). *Fed. Republic of Nigeria,* 2020 WL 6547902, at *8. The unusual nature of Petitioner's choice here was addressed by the court in *Federal Republic of Nigeria*:

> In the ordinary course, a foreign sovereign seeking evidence in the United States for use in a foreign criminal investigation or prosecution proceeds under the Mutual Legal Assistance Treaty ("MLAT") among it and the United States. It is irregular for a foreign sovereign seeking criminal-case discovery within the United States to bypass an MLAT mechanism in favor of a direct application to a federal court. A § 1782 application in this posture is so unusual that Applicants—even after Respondents noted the unusual nature of this application—were unable to identify any instance in which another foreign sovereign, having forwent the processes for obtaining U.S. discovery set forth in the MLAT, successfully obtained criminal discovery under § 1782.

> To be sure, there is no principle of law compelling a foreign nation seeking evidence in this country for use in a criminal case to proceed first via an MLAT. But there are sound reasons for generally channeling such discovery applications through the MLAT process. Doing so promotes comity and consistent outcomes as to such requests, adds protection for the domestic entities from whom discovery is sought by foreign prosecutors and criminal investigators, and assures that the U.S. government's expertise and analytic rigor is applied to the application, including to assure that the discovery is not sought for ulterior (non-prosecutive) ends. *See, e.g.*, Peter Swire & Justin D. Hemmings, *Mutual Legal Assistance in an Era of*

> *Globalized Communications: The Analogy to the Visa Waiver Program*, 71 N.Y.U.
> Ann. Surv. Am. L. 687, 699 (2017) (explaining that, under MLATs, the U.S.
> government must "review[ ] the request and deem[ ] it appropriate" before filing a
> discovery request with the federal district court).

*Id*. at 7-8; *see also In re Request from United Kingdom Pursuant to Treaty Between Gov't of U.S.*

*& Gov't of United Kingdom on Mut. Assistance in Criminal Matters in the Matter of Dolours*

*Price*, 685 F.3d 1, 11 (1st Cir. 2012) (the U.S., acting on behalf of the UK pursuant to an MLAT,

executed the requests at issue under 18 U.S.C. § 3512.)

Petitioner offers two reasons as explanation for its choice not to proceed pursuant to the

U.S. - Turkey MLAT.  First, the Turkish Prosecutor explains that the MLAT process is

cumbersome with inherent delays.  Further, as previously noted, Petitioner explains that it was

not required to undertake the process set forth in 18 U.S.C. § 3512 because the plain language of

that statute explicitly does not foreclose proceeding under 28 U.S.C. § 1782.

With respect to its first stated reason, Petitioner does not explain why time is of particular

concern here.  Nor does the Prosecutor's declaration shed any light on this issue, instead offering

only that investigations are in different stages.  Moreover, the Application indicates that certain

alleged illicit activities date back several years.  Yet Petitioner offers no insight into why time is

now a central consideration.  Similarly, Petitioner fails to explain what it finds particularly

cumbersome about the MLAT process, other than the potential for delay.  Absent a more

fulsome explanation of these concerns, the Court is not persuaded.  *See Fed. Republic of*

*Nigeria*, 2020 WL 6547902, at *9. ("Applicants' preference for speed would justify a foreign

sovereign's end-running the MLAT process potentially in every case.")

With respect to its second stated reason, certainly, as Petitioner contends, and as

explained by the court in *Federal Republic of Nigeria*, 2020 WL 6547902, Petitioner is not

required by law to proceed through the MLAT process.  Given the nature and scope of the

19

allegations here, however, it is not clear why Petitioner would choose not to do so.  That is, Petitioner details a scenario that seems particularly well-suited to the MLAT-review process and its goals of promoting comity and consistency.  Under that process, in cases in which the request seeks the production of documents or things that may be located in multiple districts, an application may be filed in any one of the districts in which such a person, documents, or things may be located under 18 U.S.C. § 3152 (c)(2).  *Dolours Price*, 685 F.3d at 11 (§ "3512 provides for a more streamlined process than under § 1782 for executing requests from foreign governments related to the prosecution of criminal offenses.").   As explained by the court in *Dolours Price,*

> Section 1782 effectively requires the Attorney General as Central Authority to respond to requests for evidence from foreign governments by filing requests with the district court in every district in which evidence or a witness may be found.  *See* 155 Cong. Rec. S6810 (daily ed. June 18, 2009) (letter from Acting Assistant Att'y Gen. Burton to Sen. Whitehouse).  In practice this requires involving multiple U.S. Attorneys' Offices and district courts in a single case.  *Id.* Section 3512, on the other hand, permits a single Assistant United States Attorney to pursue requests in multiple judicial districts, *see* 18 U.S.C. § 3512(a)(1); 155 Cong. Rec. S6809 (daily ed. June 18, 2009) (statement of Sen. Whitehouse), and allows individual district court judges to oversee and approve subpoenas and other orders (but not search warrants) in districts other than their own, *see* 18 U.S.C. § 3512(f).

*Id*. at 10–11. Rather than obtain the benefit of this streamlined process, however, Petitioner chose to pursue requests in three different districts risking inconsistent rulings and differing time schedules.

Moreover, as the above discussion suggests, foreign governments choosing to proceed under § 1782 often seek assistance from the U.S., either pursuant to an MLAT or otherwise. For example, *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 564 (9th Cir. 2011) the Russian government requested legal assistance from the United States pursuant to the US–Russia MLAT and the  "United States government petitioned the court

'pursuant to Article 7 of the [MLAT], 28 U.S.C. § 1782, and the Court's own inherent authority'

to appoint two named co-commissioners 'to collect evidence from witnesses ….'"  Notably, in

that case, the Ninth Circuit Court of Appeals went on to hold that "requests for assistance via the

US–Russia MLAT utilize the procedural mechanisms of § 1782 without importing the

substantive limitations of § 1782." *Id.* at 571.  On the other hand, in *In re Letter of Request from*

*Crown Prosecution Service of United Kingdom*, 870 F.2d 686, 687 (D.C. Cir. 1989), despite no

discussion of an MLAT, the United States brought an application under 28 U.S.C. § 1782 to

obtain evidence sought by the Crown Prosecution Service of the United Kingdom.  Similarly, *In*

*re Letters Rogatory from Tokyo District Prosecutor's Office, Tokyo, Japan*, 16 F.3d 1016, 1018

(9th Cir. 1994), although there is no mention of an MLAT, the Tokyo District Prosecutor's

Office requested assistance and the United States Attorney's Office applied for an order pursuant

to 28 U.S.C. § 1782.

Significantly, cases cited by Petitioner in support of its ability, as a foreign sovereign, to

proceed directly pursuant to § 1782 make no mention of an operative MLAT.  *See Islamic*

*Republic of Pakistan v. Arnold & Porter Kaye Scholer LLP*, No. MC 18-103 (RMC), 2019 WL

1559433, at \*9 (D.D.C. Apr. 10, 2019) (denying in part and granting part, Pakistan's Application

for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782); *In re Request for Assistance*

*from Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151, 1156 (11th Cir. 1988),

*abrogated by Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004) (affirming

district court's conclusion that a proceeding was probable upon application by the Attorney

General and Minister of Legal Affairs in Trinidad and Tobago pursuant to § 1782);  *In re*

*Application of Gov't of Lao*, 2016 WL 1389764, at \*3 (Government of Lao filed an application

pursuant to 28 U.S.C. § 1782 and court specifically noted that no MLAT existed between GOL

and the United States).  As a result, they serve as little support for Petitioner's stated desire to bypass the MLAT process.

Beyond the MLAT issue, Respondents also assert illegitimacy and bad faith as grounds for denying the Application.  Petitioner disputes that such considerations are applicable under either the statutory or discretionary analysis.  In the Court's view, however, Respondents' assertions are addressed to the issue of circumvention relevant to this factor.  Accordingly, the Court, is "at liberty to consider that circumvention in assessing whether, in its discretion, to authorize discovery in aid of [Turkey's] criminal proceedings without the benefit of DOJ's review."  *Fed. Republic of Nigeria,* 2020 WL 6547902, at *9.

Petitioner maintains that there is nothing suspect about its choice to pursue relief under § 1782, rather than through the "lengthy" MLAT process and that it should not be criticized for exercising a legal right.  (ECF No. 19 at 12.)  But, its weak justification for circumventing the MLAT process*,* cannot go unnoticed, especially where that process seems tailor-made for the circumstances Petitioner identifies.  By way of observation only, because the current record supports nothing more, the Court offers the following.   As Petitioner distills it, "evidence of criminal activity occurring within the United States is *directly relevant* to Petitioner's criminal investigation." (ECF No, 19 at 15.) (emphasis in original).  Accordingly, it is difficult to understand how U.S. policies could not in some way be implicated here.  Moreover, it seems that the confirmation of violations of U.S. law that could come via the involvement of U.S. authorities could only serve to bolster Petitioner's stated need for proof of illicit activity.  Accordingly, it seems disingenuous at best for Petitioner to expect that it can file an application alleging a host of  serious federal crimes including securities fraud, immigration fraud, violations of federal election laws, and illicit campaign contributions designed to influence the U.S.

election system, and expect that it will not be required to offer a reason for bypassing the MLAT process, and the attendant DOJ review, beyond unadorned concerns regarding time and cumbersomeness.  Stated more succinctly, Petitioner's negligibly supported Application seems to raise more questions than it answers.

In sum, Petitioner has offered nothing to convince the Court that the MLAT review procedure would not benefit its quest for the information it seeks.  Its stated reasons fail to align with its acknowledgment of the more streamlined processes such a review would permit. Further, the Court reiterates, as noted above, that the circumstances described in the application present a most compelling need for comity and consistency.  Taking all of this into account, and keeping in mind that this factor considers whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States, Turkey simply has not set forth a reasonable justification for choosing to bypass the MLAT-review procedure under the circumstances here.  Accordingly, the third *Intel* factor very substantially supports the Court's exercise of its discretion to deny Petitioner's § 1782 application.

### 4.  The Fourth *Intel* Factor

Turning to the final *Intel* factor, the Court considers whether the discovery sought is "unduly intrusive or burdensome."  *Intel,* 542 U.S at 265.  Respondents also focus on this factor at some length arguing that the requests are not narrowly tailored and are overly broad.  They further characterize Petitioner's application as "a widespread fishing expedition that would result in significant burdens and costs to the publicly funded Academies."  Respondents, however, provide no explanation of the significant burden or costs.  For its part, Petitioner argues that it has pared down its requests and that many of the Respondents would already be required to produce much of the information under the Ohio Public Records Act, 1 Ohio Rev. Code §

149.43. Petitioner also suggests that no undue burden exists here because Respondents are not being asked to travel internationally. (ECF No. 1 at 13.)

"Generally speaking, the standards for discovery set out in the Federal Rules of Civil Procedure also apply when discovery is sought under § 1782(a)." *In re Application for Discovery Pursuant to 28 U.S.C. § 1782*, 2020 WL 364222, at \*5. (citations omitted). Consequently, contrary to Petitioner's assertion, the fact that Respondents are not being asked to travel internationally is not of particular significance here. Applying general discovery standards, as explained below the subpoenas are not narrowly tailored as to scope or content. (ECF No. 14-2.) In fact, this is so to the point that it merits little discussion.

A brief overview of the proposed discovery reveals requests spanning five-year periods and, in some instances, ten-year periods. (ECF 14-2 at 40; 60 at ¶ 4.) Many of the requests are prefaced by words such as "including" or "including but not limited to," suggesting that they should be read more broadly. (*Id*. at 59.) Other requests, by way of example, are prefaced by the word "all," seeking things such as "contracts, subcontracts, bids, requests for proposals, invoices, services agreements, e-mails, and payment records, reflecting the contemplated and actual scope of work, or the specific goods provided in exchange for the payment." (*Id.*) These requests are overly broad and would be unduly burdensome, particularly in light of the acknowledged non-party status of the Respondents and the length of time covered by the requests. *financialright GmbH v. Robert Bosch LLC*, 294 F. Supp. 3d at 739–40 (finding similar requests overly broad and denying § 1782 application).

For these reasons, the fourth *Intel* factor weighs against granting the Application. Given the sheer number and format of the subpoenas, the Court is not inclined to "trim" the requests to something more reasonable, a task that would require substantial effort. *financialright GmbH,*

294 F. Supp. 3d at 739–40 (similarly declining to do so where trimming the 25 document requests at issue to something more reasonable would require significant effort). Moreover, the Court will not do so here because it finds that the discretionary factors, taken together, warrant denial of the request for § 1782 relief. Finally, the Court notes that, by Petitioner's own admission, much of the information sought here would be available through a public records request. Further, as discussed above, Petitioner is not prejudiced because the MLAT process remains available as a mechanism to aid in obtaining the information it seeks.

**IV.**

For the foregoing reasons, Petitioner's Application (ECF No. 1) is **DENIED.**[5]

       **IT IS SO ORDERED.**


Date: **February 22, 2021**                 ***/s/ Elizabeth A. Preston Deavers***
                                                     **ELIZABETH A. PRESTON DEAVERS**
                                                       **UNITED STATES MAGISTRATE JUDGE**

---

[5] Petitioner suggests that the Court should issue subpoenas to parties who did not object to the Application. (ECF No. 19 at 1 n.1.) This Opinion and Order denies Petitioner's Application in its entirety and the Court, therefore, finds no merit to this argument.